## CARY et al. v. LOVELL' MANUF'G Co., Limited.

*(Circuit Court, W. D. Pennsylvania. January 26, 1889.)*

PATENTS FOR INVENTIONS—INFRINGEMENT—DAMAGES—LICENSE FEE. ·
> Two licenses for the future use of a patented process at a specified rate per pound of springs shown to have been regularly paid by the licensees. although one of said licenses was granted only a few days before the bill in this case was filed, and the other was granted during its pendency. and in each instance there was also the payment of a gross sum for past infringement, *held* to be admissible in this suit as evidence tending to show an established license fee; and sufficient, in connection with evidence of a previous settlement between the patentee and his firm at the same rate for the permitted use of said process, and other evidence of the reasonableness of said rate, to charge the defendant with damages on that basis.

In Equity. Bill for infringement of patent. See 31 Fed. Rep. 344.
On exceptions to master's report.

*Witter & Kenyon,* for complainants.

*John K. Hallock* and *W. Bakewell & Sons,* for respondent.

Before MCKENNAN and ACHESON, JJ.

PER CURIAM. The master, being of opinion that the license for the future use of the patented process at the rate of two cents per pound of springs, granted to R. H. Wolff & Co., Limited, on March 2, 1885, and the like license, at the same rate, granted to Gibson, Parish & Co., on November 14, 1885, were inadmissible as evidence, refused to hold the defendants liable for damages upon the basis of an established license fee. And as he has found that there is no satisfactory evidence disclosing what part, if any, of the defendants' profits was due to the use of the patented process, or to show that the plaintiffs had sustained a loss of trade, or any other special damage, the up-shot of the matter is that, if the master's report stands, the plaintiffs will receive nothing but nominal damages for the defendants' infringement. Is this a just conclusion to this litigation? The only reason assigned by the learned master for his rejection of the licenses as items of proof is that "they were practically settlements of pending litigations between the complainants and the parties taking said licenses," and (unless in the case of the Wolff license) were "made after the commencement and during the pendency" of this suit. But to determine properly the question of the admissibility of these licenses as evidence, and the effect to be given to them, it is, we think, necessary, not only to consider more closely than the master seems to have done the licenses themselves, and the circumstances under which they were executed, but also to take a somewhat broader view of the case as a whole than his report presents. And reversing the above order of procedure, we first remark that this record throughout exhibits proof of the real merit of the Cary invention, and it is clearly shown that the patented process had great money value. For example, in each of the four proved instances in which there were settlements for past infringements, substantial damages therefor were paid to the plaintiffs.

Again, it appears that the West, Bradley & Cary Manufacturing Company—of which the plaintiff Cary was a member—manufactured springs under a verbal license' from him, and that that company, besides discharging large liabilities connected with the litigation touching the patent, in a settlement made with Cary in April, 1876, allowed him for the use of the patent the sum of $14,000, which Mr. Cary testifies was .arrived at by computing two cents a pound on all springs they had treated by the patented process. Furthermore, it is shown that from June, 1881, to the latter part of 1883, the defendants made large purchases from the plaintiffs of springs tempered by the patented process, and there is evidence that the plaintiff's profits upon those springs, due to said process, considerably exceeded two cents per pound. We are, then, of opinion that, aside from the two particular instances of license in question, the proofs tend strongly to the conclusion that a royalty of two cents per pound was a reasonable and just rate during the period of the defendants' infringement.

Now, the defendants began their infringing manufacture in March, 1884, and they pursued it until March 28, 1885, when they were restrained by preliminary injunction. But the court, by an order made in February, 1886, having suspended the injunction upon the defendants giving security to pay to the plaintiffs such amount as might be adjudged to them on springs thereafter manufactured by the defendants, the latter resumed their infringing operations, and continued the same until the final injunction was granted in July, 1887. As we have seen, the license to R. H. Wolff & Co., Limited, was executed on March 2, 1885, which was 12 days before the bill in this case was filed. Gibson, Parish & Co. were licensed while the preliminary injunction was in force, and about four months before the second period of the defendants' infringement began. Both those licenses, it will be perceived, were in full operation when the defendants elected to resume their infringing manufacture, and they took the risk of being compelled to pay damages on the basis of the rate of license thus established. We have carefully examined the provisions of those instruments, and all the evidence on the subject, and we are unable to discover anything which casts the slightest doubt on the good faith of either transaction. They seem to have been fair business arrangements, voluntarily entered into by the respective parties. R. H. Wolff & Co., Limited, had never been sued at all. That company had infringed to a very limited extent, and at the time it was licensed paid $500 therefor; but it was not bound to take a license for the future. Gibson, Parish & Co., indeed, had been sued and settled for past infringement by paying $1,000; but they were under no sort of coercion to take a future license. Both those licensees regularly paid the stipulated royalty of two cents a pound on the springs manufactured by them under the patent from the dates of their respective licenses down to the expiration of the patent in June, 1888. Why, then, are those licenses not competent evidence as bearing upon the fair market value of a privilege which an infringer has wrongfully undertaken to exercise? We have critically examined the decisions referred to by the

master, and the other cases cited by the defendants' counsel, but cannot concur in the view that they warrant the exclusion of said licenses from consideration. We think that this case, in its facts, is plainly distinguishable from all the cases relied on to sustain the ruling of the learned master, and we are constrained to hold that he was in error in deciding that said licenses were inadmissible "as evidence showing or tending to show an established royalty for the use of the Cary patent."

But it is contended that the license granted by the plaintiffs to the Domestic Spring Bed Company, on March 19, 1886, for the sum of $2,500, to cover past infringement and future use, shows that there was, in fact, no uniform or established license fee. But the right thereby granted to that company was exclusively a shop-right to temper by the patented process only such springs as the company had used or might thereafter use in their own beds. That company was not making springs for the market, and hence the case was exceptional, and materially different from the cases of R. H. Wolff & Co., Limited, Gibson, Parish & Co., and the defendants. In addition to the two instances of license at the royalty of two cents per pound, we have the settlement already discussed between the patentee and the West, Bradley & Cary Manufacturing Company at the same rate, and also the other recited corroborative evidence as to the reasonableness of that rate; and, taking the proofs altogether, we are of opinion that the defendants are justly answerable to the plaintiffs in damages upon that basis. In *Clark* v. *Wooster*, 119 U. S. 326, 7 Sup. Ct. Rep. 219, which like the present case was a suit in equity, the court, speaking of an established license fee and the sufficiency of the proof thereof, said:

"It is a general rule in patent causes that established license fees are the best measure of damages that can be used. * * * The complainant proved several instances of licenses given by him to large sewing machine companies, the fees on which were regularly paid, and corresponded with the rate allowed by the master. We think that the defendants have no occasion to complain of the amount awarded."

How many instances of license were there shown does not appear, but we think the language of the court fully justifies the conclusion we have reached here upon the proofs before us.

The plaintiffs ask the court, under the statutory authority, to increase the damages, but this we must decline to do. The master reports that the defendants have manufactured by the patented process 437,267 pounds of springs, which, at two cents per pound, amount to $8,745.34; and for this sum the plaintiffs are entitled to a decree. Let a decree be drawn in favor of the plaintiffs in accordance with the foregoing opinion.